TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

KENT E. CATTANI
CHIEF COUNSEL
CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA  85007-2997
TELEPHONE:  (602) 542-4686
(STATE BAR NUMBER 010806)
E-MAIL: CADocket@azag.gov

ATTORNEYS FOR DEFENDANTS

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffrey Timothy Landrigan,<br><br>    Plaintiff,<br><br>-vs-<br><br>Janice K. Brewer, Governor of Arizona; Charles L. Ryan, Director, Arizona Department of Corrections; Ernest Trujillo, Warden, Arizona Department of Corrections – Eyman; Carson McWilliams, Warden, Arizona Department of Corrections – Florence; Does 1 – 50,<br><br>    Defendants. | CV–10–02246–ROS<br><br>Response to Complaint for Equitable Injunctive and Declaratory Relief [42 U.S.C. § 1983] and Response to Motion for Temporary Restraining Order or Preliminary Injunction<br><br>[Death Penalty Case]<br><br>(The Hon. Roslyn O. Silver) |

Plaintiff Jeffrey Landrigan has filed a Complaint for Equitable, Injunctive, and Declaratory Relief under 42 U.S.C. § 1983, arguing that the Arizona Department of Corrections ("ADC") has improperly refused to provide information relating to its acquisition of the drugs used to carry out his scheduled execution. Based on that same argument, Landrigan has also filed a Motion for Temporary Restraining Order or Preliminary Injunction barring his execution scheduled for October 26, 2010.

This Court should reject Landrigan's requests for relief for several reasons. First, ADC Director Charles Ryan has avowed that ADC has lawfully obtained the necessary chemicals to carry out Landrigan's pending execution. The information Landrigan seeks relating to the source of the chemicals is not subject to disclosure under A.R.S. § 13-757(C), because the statute prohibits disclosure of confidential information relating to the identity of individuals and entities involved in carrying out the execution and those performing ancillary functions.

Second, to the extent Landrigan complains that the drug used to anesthetize him (sodium thiopental) may not work properly and may result in suffering if the drug fails to render him unconscious, his concern is unfounded. There are extensive procedures and protocols in place, including the use of medical equipment and physical monitoring by a member of the Medical Team, that will ensure that an inmate is in fact unconscious before lethal drugs are administered.

Third, Landrigan has not cited to any compelling authority for his assertion that the State should be limited to using drugs manufactured by a single manufacturer—Hospira, or that FDA regulations govern the use of sodium thiopental in executions or otherwise preclude acquisition of sodium thiopental from a manufacturer other than Hospira.

Fourth, the United States Supreme Court has made clear that challenges to an execution protocol brought under 42 U.S.C. § 1983 should not be used as an improper delay tactic. *See Hill v. McDonough*, 547 U.S. 573, 584 (2006). Landrigan's belated attempt to raise this issue should not be countenanced, particularly since he had an opportunity to fully litigate issues relating to Arizona's lethal injection protocol in post-conviction proceedings in state court during the past 3 years.

**MEMORANDUM OF POINTS AND AUTHORITIES**

"A preliminary injunction is an 'extraordinary and drastic remedy[.]'" *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (quoting 11A C. Wright, A. Miller, &

M. Kane, Federal Practice and Procedure § 2948, p. 129 (2d ed. 1995)).  A litigant has no inherent right to such an extraordinary remedy.  *Winter v. Natural Resources Defense Council*, 555 U.S. ___, 129 S. Ct. 365, 376 (2008).  A petitioner seeking a preliminary injunction must demonstrate:  (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tip in his favor," *and* (4) "that an injunction is in the public interest."  *Winter*, 129 S. Ct. at 374; *see also Jones v. Bank of America*, 2010 WL 2572997, *3 (D. Ariz. 2010).  The petitioner must clearly show that he is entitled to relief.  *Winter*, 129 S. Ct. at 376; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*).

**A.    Landrigan is not likely to succeed on the merits**

To establish an Eighth Amendment cruel and unusual punishment claim, the petitioner must demonstrate that the risk is "*sure or very likely* to cause serious illness and needless suffering," and give rise to "sufficiently *imminent* dangers."  *Baze v. Rees*, 553 U.S. 35, 50 (2008) (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993) (emphasis original)).  In other words, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"  *Baze*, 553 U.S. at 50 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846 n.9 (1994)).  A mere risk of accidental harm is insufficient.  *Baze*, 553 U.S. at 50.  To the extent an inmate proposes an alternative procedure, it  "must be feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain."  *Baze*, 553 U.S. at 53.

Under Arizona's lethal injection protocol, no such objectively intolerable risk exists, and Landrigan has not proffered a feasible, readily implemented alternative procedure that would significantly reduce a substantial risk of severe pain.  Thus, he has not demonstrated a likelihood of success on the merits.

1. ADC has lawfully obtained the necessary chemicals to carry out

Landrigan's pending execution and ADC has provided necessary information relating to the execution protocol. (See Attachment A, Affidavit of ADC Director Charles Ryan, dated October 8, 2010.) Contrary to Landrigan's assertions, ADC has not been secretive about the execution protocol and the protocol in fact has been available on ADC's website since September 2009.

The information ADC has declined to provide is confidential under A.R.S. § 13-757(C), which provides as follows:

> The identity of executioners and other persons who participate or perform ancillary functions in an execution and any information contained in records that would identify those persons is confidential and is not subject to disclosure pursuant to title 39, chapter I, article 2.1.

Individuals or entities providing the necessary chemicals to ADC are performing ancillary functions in the execution process, and requiring ACD to provide information such as the source of the chemicals, labels, lot numbers, and chain-of-custody, would lead to the identity of those individuals and entities. Landrigan's pleadings demonstrate that he has been attempting to ascertain the identity of the manufacturer who supplied the drugs to be used for the execution by tracking expiration dates or other information that can be traced to the manufacturer. The source information Landrigan seeks is confidential under § 13-757(C) and is not subject to disclosure.

2. There is no compelling need to require ADC to disclose the confidential information requested. Landrigan speculates that ADC might have somehow acquired substandard sodium thiopental that might not work properly in rendering him unconscious during the execution process. However, Arizona's lethal injection protocol already provides several safeguards to ensure that a defendant is unconscious before administering the lethal chemicals. In *Dickens v. Brewer*, No. CV07-1770-PHX-NVW, 2009 WL 1904294 (D.Ariz., July 1, 2009), in rejecting a

4

1 lethal injection protocol challenge raised by several other Arizona inmates, this
2 Court noted that, as with a surgical procedure in a hospital, a patient's depth of
3 consciousness is generally determined by physical examination:

> The examination may begin by telling the patient to open his eyes or squeeze his hand. If the patient does not respond, the anesthesiologist may look for a simple reflex response to stroking the patient's eyelashes or another tactile stimulus. Electronic monitors may be used to measure brain activity, but observing a patient's spontaneous breathing is as good or better an indicator of the depth of anesthesia. If the patient changes his pattern of breathing in response to certain surgical stimuli, the patient is not adequately anesthetized. If the patient is breathing too slowly or too shallowly, the patient is too deeply anesthetized. If the surgery requires that the patient be paralyzed and unable to breathe independently, then the patient's breathing would not indicate depth of consciousness. If a patient were paralyzed and conscious, his heart rate and blood pressure probably would increase.

*Id*. at *12.

This Court further noted the protections in place to ensure that the inmate is unconscious prior to the administration of lethal drugs:

> The Arizona Protocol requires that a microphone "be affixed to the inmate's shirt to enable the Medical Team and Special Operations Team Leader to verbally communicate directly with the inmate and hear any utterances or noises made by the inmate throughout the procedure." It requires that the inmate "be positioned to enable the Medical Team and Special Operations Team Leader to directly observe the inmate and to monitor the inmate's face with the aid of a high resolution color NTSC CCD camera with 10x Optical zoom lens with pan tilt capability and a 19-inch resolution color monitor." It requires the Medical Team to "continually monitor the inmate's level of consciousness and electrocardiograph readings, maintaining constant observation of the inmate utilizing direct observation, audio equipment, camera and monitor as well as any other medically approved method(s) deemed necessary by the Medical Team." It requires the warden to "physically remain in the room with the inmate throughout the administration of the chemicals in a position sufficient to clearly observe the inmate and the primary and backup IV sites for

5

any potential problems." Further, after administration of the sodium thiopental and heparin/saline flush, the Medical Team must "confirm the inmate is unconscious by sight and sound, utilizing the audio equipment, camera and monitor," and a Medical Team member must "enter into the room where the inmate is located to physically confirm the inmate is unconscious, and that the catheter and lines are affixed and functioning properly, using methods deemed medically necessary." Although the Arizona Protocol does not define "methods deemed medically necessary," it is likely that Medical Team members, who must be medically trained, would be able to assess consciousness by telling the patient to respond and, upon receiving no response, be able to look for a simple reflex response to a tactile stimulus.

*Id*. at *21. Thus, having a properly trained and credentialed individual examine the inmate after the administration of the sodium thiopental "mitigates the risk that the inmate will suffer excruciating pain during his execution." *Id*. at *12.

Because there are multiple procedures in place to ensure that an inmate is unconscious before lethal chemicals are administered, Landrigan's speculative complaints about possible problems with a "defective" dose of sodium thiopental do not create a colorable claim. Landrigan will only suffer harm if lethal drugs are administered while he is conscious, and the protocol described above adequately protects against such harm.

3. Landrigan has not cited to any compelling authority for his assertion that the State should be limited to using drugs manufactured by a single manufacturer—Hospira, or that FDA regulations govern the use of sodium thiopental in executions or otherwise preclude acquisition of sodium thiopental from a manufacturer other than Hospira. The Arizona Protocol does not require that the State acquire sodium thiopental from any particular source, and it would be illogical to do so, since the drug is simply a chemical compound, and Landrigan has not established that any one manufacturer has an exclusive patent on that compound.

Landrigan cites to FDA regulations, which relate generally to consumer protection—the Food, Drug & Cosmetics Act's purpose is to protect the health and safety of the public by preventing adulterated, misbranded, or untested articles from entering interstate commerce. *See United States v. Sullivan*, 332 U.S. 689 (1948). However, Landrigan has not proffered any authority suggesting that the "health and safety" concerns regulated by the FDA are applicable in the context of acquiring drugs for use in an execution.

4. Landrigan's belated attempt to raise this issue is an improper delay tactic. In *Hill v. McDonough*, the United States Supreme Court ruled that 42 U.S.C. § 1983 provides a vehicle for raising claims that a state's execution protocol violates the United States Constitution. 547 U.S. at 579-80. The Court noted, however, that in considering whether to grant a stay based on a challenge to a state's execution protocol, "courts should not tolerate abusive litigation tactics," *Id.* at 582, and a court must apply "a strong presumption against the grant of a stay where a claim could have been brought at such time as to allow consideration of the merits without requiring entry of a stay." *Id.* at 584 (citing *Nelson v. Campbell*, 541 U.S. 637, 650 (2004)).

Landrigan litigated the constitutionality of Arizona's execution protocol in a state post-conviction proceeding that commenced in 2007. He did not raise any concerns relating to whether the Arizona protocol inadequately details how the chemicals used in the execution are to be obtained, and it is too late to do so now. Furthermore, Landrigan's current counsel, Dale Baich, was involved in defending an inmate executed in Ohio in May 2010, and Mr. Baich is quoted in newspaper articles during that time period responding to questions discussing an alleged shortage of sodium thiopental. (See Attachment B, CantonRep.com, "Ohio faced execution drug shortage.") Thus, Landrigan has not provided a plausible explanation for waiting to file a § 1983 action until less than 5 days before his scheduled execution, and there is no reasoned basis in law or equity for granting

7

1 the relief requested.

## B. Landrigan is not likely to suffer irreparable harm

Landrigan has not demonstrated a likelihood that he will suffer irreparable harm if injunctive relief is not granted. The harm at issue is not his death, but rather constitutionally impermissible pain. Landrigan has not demonstrated how such pain is likely, particularly given the extensive protections outlined above for ensuring that an inmate is unconscious before lethal drugs are administered.

"Unlike a surgical context where an anesthesiologist must avoid too deeply anesthetizing the patient," the use of anesthesia in an execution is much less complicated; the only concern is ensuring that the inmate is unconscious. *Dickens*, 2009 WL at *21. The Arizona protocol requires a 5-gram dose of sodium thiopental, which is 11 to 18 times more than required to produce a loss of consciousness. *Id.* at *11. The dose administered will cause burst suppression in less than three minutes and last at least 45 minutes, *Id.* at *22, which is much longer than the 7 to 8 minute duration of the execution process. Given the "overdose" of sodium thiopental required by Arizona's protocol, and most importantly, given the careful monitoring of the inmate's consciousness throughout the process, Landrigan has not established a likelihood that he will be conscious and/or experience unnecessary pain during the execution process.

## C. The balance of equities favor the State, and denying the request for an injunction would serve the public interest.

This Court must exercise its discretion in balancing the competing claims in deciding whether to grant relief. *Winter*, 129 S. Ct. at 376. In doing so, this Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 376-77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

By promulgating A.R.S § 13-757(C), the State of Arizona has made the policy decision that information relating to the identity of individuals and entities

8

involved in the execution process, including those who perform ancillary functions, should remain confidential. This policy enables participation in the execution process (a function mandated by Arizona law) without fear of harassment or intimidation by those who may oppose capital punishment. Given that the information Landrigan seeks is not critical to ensure that he does not suffer unnecessarily during his execution, the confidentiality provisions of A.R.S. § 13-757 should be honored.

Landrigan murdered his Arizona victim more than two decades ago. Both Arizona and the federal government have embraced a policy determination that surviving victims are entitled to a "prompt and final conclusion of the case after the conviction and sentence." Ariz. Const. art 2 § 2.1(A)(10); 18 U.S.C. § 3771(a)(7); (b)(2)(A) ("proceedings free from unreasonable delay"). Moreover, the States have a strong interest in enforcing their judgments to finality. *See*, *e.g.*, *Calderon v. Thompson*, 523 U.S. 538, 555-57 (1998); *Gomez v. U.S. District Court for N. Dist. Cal*, 503 U.S. 653, 654 (1992) (*per curiam*); *In re Blodgett*, 502 U.S. 236, 239-40 (1992).

Landrigan has had more than 3 years to litigate concerns relating to Arizona's lethal injection protocol. During state post-conviction proceedings in which he challenged Arizona's protocol, he did not challenge provisions regarding how drugs are obtained. Furthermore, in his petition for review to the Arizona Supreme Court from the denial of his successive petition for post-conviction relief, he raised only state constitutional grounds as a basis for relief. Landrigan's failure to pursue this type of federal constitutional claim, as well as his failure to file a § 1983 action until less than a week prior to his scheduled execution, weighs against granting the injunctive relief he now seeks.

Furthermore, Landrigan's counsel was obviously aware of the § 1983 action (*Dickens*) filed by several other Arizona inmates, since that litigation was referenced extensively in Landrigan's state post-conviction proceedings.

1  Nevertheless, Landrigan chose not to join in that litigation.  He is instead
2  essentially attempting to have a different judge overrule Judge Neil Wake's
3  decision in *Dickens* that Arizona's protocol is constitutional.

4  The record developed in *Dickens* demonstrated that ADC takes its
5  responsibility to carry out an execution seriously and has attempted to construct a
6  protocol to carry out executions as humanely as possible.  Judge Wake noted in
7  *Dickens* that the Arizona Protocol provides for the exercise of administrative
8  and/or medical judgment, which should be distinguished from amending the
9  Protocol, and Judge Wake found that the court "cannot presume that [ADC] will
10 amend it in a manner that will impose on inmates a substantial risk of serious
11 harm."  2009 WL at *24.  Landrigan's speculative assertions do not overcome that
12 presumption.

13 Given the United States Supreme Court directive in *Hill v. McDonough* that
14 challenges to an execution protocol be viewed with skepticism when filed as a last
15 minute attempt to delay an execution, and given Landrigan's counsel's prior
16 awareness of the issue Landrigan now raises, his assertions of potential harm
17 mandating immediate court intervention ring hollow.  Landrigan has not
18 established an equitable basis for the relief he has requested, and this Court should
19 deny his motion for temporary restraining order or for injunctive relief.

20 DATED this 22nd day of October, 2010.

RESPECTFULLY SUBMITTED,

TERRY GODDARD
ATTORNEY GENERAL

s/
KENT E. CATTANI
CHIEF COUNSEL
ATTORNEYS FOR DEFENDANTS

| | |
|---|---|
| 1 | I hereby certify that on this 22nd day of October, 2010, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant: |
| 2 | |
| 3 | |
| 4 | JON M. SANDS<br>Federal Public Defender<br>Dale A. Baich |
| 5 | Sylvia J. Lett<br>Karen Wilkinson |
| 6 | Sarah Stone<br>Robin C. Konrad |
| 7 | Assistant Federal Public Defenders<br>850 West Adams, Suite 201 |
| 8 | Phoenix, Arizona 85007 |
| 9 | Attorneys for Plaintiff |
| 10 | |
| 11 | s/_____<br>L.L. KUGLER |
| 12 | 1236847 |

11

# ATTACHMENT A

| | |
|---|---|
| 1 | STATE OF ARIZONA      ) |
| 2 | COUNTY OF MARICOPA  ) ss.   **AFFIDAVIT OF CHARLES L. RYAN** |

   I, Charles L. Ryan, declare under penalty of perjury, the following to be true and accurate to the best of my belief:

1. I am currently the Director of the Arizona Department of Corrections (ADC). I was appointed to this position by Governor Janice K. Brewer.

2. I am familiar with the Departments execution protocols—Department Order 710 and Attachment F, the administration of chemicals.

3. The Department has lawfully obtained the necessary chemicals under its current written protocol—sodium thiopental, pancuronium bromide, and potassium chloride—in sufficient quantity for an execution.

4. The Department of Corrections intends to follow the current protocol as written with respect to the upcoming scheduled execution on October 26, 2010, 10:00 a.m.

DATED this ___8th___ day of October, 2010.

_____
Charles L. Ryan

SUBSCRIBED AND SWORN to before me this 8th day of October, 2010.

___Mary K. Fuller___
Notary Public

My Commission expires: August 21, 2013

OFFICIAL SEAL
MARY K. FULLER
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Aug. 21, 2013

# ATTACHMENT B



## Ohio faced execution drug shortage

**By Andrew Welsh-Huggins**
**The Associated Press**
Posted May 12, 2010 @ 12 07 AM

 Recommend  Be the first of your friends to recommend this.

COLUMBUS — A worldwide shortage of an anesthetic used in lethal injections across the country almost kept Ohio from proceeding with an execution scheduled for Thursday.

The Department of Rehabilitation and Correction finally procured enough thiopental sodium on Monday afternoon for the scheduled execution of a man sentenced to die for shooting a man he met in 1983.

An attorney for the state had warned a federal judge Friday and again Monday that the prisons department might not be able to find enough thiopental sodium to proceed with the execution of Michael Beuke, of Cincinnati.

At issue was having on hand a full amount of the anesthetic, which would include the amount needed to put Beuke to death and backup doses called for in the state's execution policy. The state said it had enough for the execution but not enough for those backup doses.

"I have to say frankly, Your Honor, at this time there's still a question about whether it can be obtained," Charles Wille, principal assistant attorney general, told U.S. District Court Judge Gregory Frost at Monday's hearing, according to a transcript reviewed by The Associated Press.

Officials at the prisons department "indicate to me that all of the options are being considered and that they will tell me as fast as they know," Wille said.

Later in the hearing, Wille received an e-mail from the prisons department saying enough of the drug had been found.

The attorney general's office, which represents the prisons, would not release the e-mail Tuesday, saying it was protected under the attorney-client privilege.

The shortage should not affect other upcoming executions, prisons spokeswoman Julie Walburn said Tuesday.

The anesthetic is produced by Hospira Inc., of Lake Forest, Ill., which attributed the shortage to "manufacturing issues" in a May 4 bulletin. The drug should be available at some point in the third quarter, which runs from July through September. Hospira is the only company in the world that makes the drug, said spokesman Dan Rosenberg, who declined further comment.

Texas, with the nation's busiest death chamber, has the chemical on hand, "so it is not currently an issue for us," said prisons spokeswoman Michelle Lyons.

The shortage is also not an issue in Washington state, which earlier this year switched to a single drug system but has no executions scheduled, a prisons spokeswoman said.

Ohio last year became the first state to switch to a single intravenous dose of anesthetic for executions. If that fails, its backup method, which has never been used, calls for the sedative midazolam to be injected into muscle, followed by the painkiller hydromorphone.

Beuke is challenging the backup method, saying a tolerance he has to midazolam because of medicine he takes for a seizure disorder could cause side effects from the hydromorphone.

The judge rejected Beuke's tolerance argument late Tuesday, and Beuke immediately appealed.

Beuke's attorney, Dale Baich, had no comment on the anesthetic shortage, saying it wasn't part of their legal challenge.

Beuke, 48, was sentenced to die for the murder of Robert Craig, a driver he shot while hitchhiking in southwest Ohio.

Beuke has asked Gov. Ted Strickland to spare him, saying he's remorseful and has turned his life around in prison.

*Associated Press writers Michael Graczyk in Houston and Rachel La Corte in Olympia, Wash., contributed to this report.*

Copyright 2010 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed