TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

KENT E. CATTANI
CHIEF COUNSEL
CRIMINAL APPEALS/CAPITAL LITIGATION SECTION

JEFFREY ZICK
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA 85007-2997
TELEPHONE:  (602) 542-4686
(STATE BAR NUMBER 010806)
E-MAIL: CADocket@azag.gov

ATTORNEYS FOR DEFENDANTS

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Jeffrey Timothy Landrigan,<br><br>      Plaintiff,<br><br>-vs-<br><br>Janice K. Brewer, Governor of Arizona; Charles L. Ryan, Director, Arizona Department of Corrections; Ernest Trujillo, Warden, Arizona Department of Corrections – Eyman; Carson McWilliams, Warden, Arizona Department of Corrections – Florence; Does 1 – 50,<br><br>      Defendants. | CV–10–02246–ROS<br><br>Disclosure of Information / Motion to Reconsider October 23, 2010, Order / Motion to Permit Filing of Further Information Under Seal<br><br>[Death Penalty Case]<br><br>(The Hon. Roslyn O. Silver) |

## DISCLOSURE

Pursuant to this Court's Order dated October 23, 2010, the State of Arizona provides the following information relating to the expiration dates of the drugs the State has acquired for use in the upcoming execution:

   Thiopental Sodium Injection, Powder for Reconstitution, 500 mg vials, Expiration Date:  May 2014.

   Pancuronium Bromide, Strength 1 mg/ml, Expiration Date: November 2011.

   Potassium Chloride Concentrate 15%, Strength 2 meq/ml, Expiration Date: January 2013.

The State further avows that the process of shipping and receiving the chemicals was cleared and approved by U.S. Customs and Food and Drug Administration ("FDA") officials.

## MOTION TO RECONSIDER

The State respectfully requests that this Court reconsider its October 23, 2010, Order to the extent it requests information beyond that provided above. This Court's Order improperly engrafts a requirement that the State use FDA-approved drugs, and the Order does not address the protections that are in place to ensure that an inmate is unconscious following the administration of sodium thiopental. Furthermore, the Order disregards the confidentiality concerns underlying A.R.S. § 13–757 and requires that the State disclose information that would lead to the identity of individuals involved in functions ancillary to the execution process. Finally, this Court's Order runs counter to the United States Supreme Court's directive in *Baze v. Rees*, 553 U.S. 35, 50 (2008), that courts not be used as "boards of inquiry" to determine best practices for executions. Alternatively, the State requests that this Court reconsider its directive that the information be disclosed publicly and requests permission to instead file it under seal.

### *The FDA Does Not Exercise Authority Over the Manufacture of Drugs Used in Executions.*

Although this Court stated that it "does not assume that the Eighth Amendment categorically prohibits the use of non-FDA approved drugs" (Order at 3), this Court has implicitly assumed that the FDA exercises some sort of authority over the manufacture of drugs for use in executions. That assumption is incorrect.

*See Heckler v. Chaney*, 470 U.S. 821, 823–25 (1985) (holding that the FDA's refusal to initiate enforcement proceedings under the federal Food, Drug, and Cosmetic Act with respect to drugs used to perform lethal injections is not subject to judicial review). *See also Use of Drug Challenged in Death Penalty Case*, New York Times, dated October 22, 2010 (quoting FDA spokeswoman Shelly Burgess as stating that executions are "clearly not under our purview or authority.") (Attachment A.). Accordingly, the question whether any given drug to be used in an execution is FDA approved is based on the faulty premise that such approval is necessary.

### *The Arizona Protocol Provides For Procedures That Ensure That An Inmate Is Unconscious After Sodium Thiopental Is Administered.*

This Court's Order does not address in any way the myriad of protections in place to ensure that an inmate is unconscious following the administration of sodium thiopental. As detailed in the State's response to Landrigan's Complaint, Arizona's lethal injection protocol provides multiple protections, including the use of a microphone and a high resolution camera, as well as physical examination of the inmate, to ensure that the inmate is unconscious prior to the administration of pancuronium bromide and potassium chloride. Given those protections—which are similar to those employed during surgical procedures in hospitals—Landrigan's Eighth Amendment claim would only be viable if he could establish not only that the drugs to be used are somehow substandard, but also that the medical team monitoring his level of consciousness will not comply with the Arizona protocol. That level of speculation does not warrant injunctive relief. *See Baze*, 553 U.S. at 50 (a petitioner alleging an Eighth Amendment violation relating to an execution protocol must demonstrate that the risk is "sure or very likely to cause serious illness and needless suffering, and give rise to "sufficiently imminent dangers").

***Source Information Is Confidential Under Arizona Law.***

With regard to the confidentiality required under A.R.S. § 13–757, this Court has interpreted that statute to apply only to individuals and not to "entities." That interpretation disregards that corporations or other entities have officers and employees who are "individuals" and are presumably entitled to the same level of confidentiality as anyone else participating in an execution or performing "ancillary functions in an execution." *See* A.R.S. § 13–757(C). The information requested (beyond what has been disclosed) would lead to the identity of individuals participating in an ancillary function in an execution and should not be made public.

***This Court's Order Is Inconsistent With The Supreme Court's Directive That Courts Not Be Transformed Into Boards of Inquiry Charged With Determining "Best Practices."***

In *Baze*, the United States Supreme Court rejected an argument that a one-drug protocol, or additional monitoring by trained personnel to ensure the adequate delivery of sodium thiopental, identified a significant risk of harm actionable under the Eighth Amendment:

> Permitting an Eighth Amendment violation to be established on such a showing would threaten to transform courts into boards of inquiry charged with determining "best practices" for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology. Such an approach finds no support in our cases, would embroil the courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing their execution procedures—a role that by all accounts the States have fulfilled with a an earnest desire to provide for a progressively more humane manner of death.

553 U.S. at 51 (citation omitted).

Here, by accepting at face value Landrigan's argument that only FDA-approved or manufactured chemicals can be used in an execution, and by suggesting a need to "weigh the relative risks of using non-FDA approved drugs, and their effectiveness, compared to that of drugs manufactured by an FDA-

4

approved source" (Order at 3), this Court has essentially transformed itself into a board of inquiry to determine a "best practice" for executions.

### *Landrigan's Request For Information Is An Improper Delay Tactic.*

Finally, this Court's analysis of the timeliness of Landrigan's claim disregards that he had more than 2 years to develop arguments relating to Arizona's execution protocol in state post-conviction proceedings. Although Arizona's protocol does not require that FDA-approved drugs be used in the execution, Landrigan did not challenge that "omission" to the protocol. Moreover, in petitioning for review to the Arizona Supreme Court from the denial of post-conviction relief, he argued only that the Arizona protocol violated the *Arizona* Constitution, with no reference to the United States Constitution. Landrigan's belated Eighth Amendment claim does not warrant relief under *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (courts must apply "a strong presumption against the grant of a stay where a claim could have been brought at such time as to allow consideration of the merits without requiring entry of a stay).

## CONCLUSION

The State of Arizona respectfully requests that this Court reconsider its October 23, 2010 Order to the extent it requires disclosure of information beyond what has been provided here. Alternatively, the State requests that this Court order that any further information relating to the drugs acquired for use in the upcoming execution be provided under seal.

DATED this 25th day of October, 2010.

RESPECTFULLY SUBMITTED,

TERRY GODDARD
ATTORNEY GENERAL

s/
KENT E. CATTANI
CHIEF COUNSEL
ATTORNEYS FOR DEFENDANTS

5

1  I hereby certify that on this 25th day of October, 2010, I electronically transmitted the attached document to the Clerk's Office using the ECF
2  System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:
3
   JON M. SANDS
4  Federal Public Defender
   Dale A. Baich
5  Sylvia J. Lett
   Karen Wilkinson
6  Sarah Stone
   Robin C. Konrad
7  Assistant Federal Public Defenders
   850 West Adams, Suite 201
8  Phoenix, Arizona 85007

9  Attorneys for Plaintiff

10
   s/
11 L.L. Kugler

12 1242026

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT A

**The New York Times** • Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



October 22, 2010

# Use of Drug Challenged in Death Penalty Case

**By JOHN SCHWARTZ**

Arizona plans to execute Jeffrey Landrigan next week, but his lawyers are arguing that one of the drugs that the state intends to use to end his life may not be good enough.

The planned execution of Mr. Landrigan, convicted of murder in 1990, coincides with a shortage of the anesthetic used in the state's execution protocol, sodium thiopental. The thiopental shortage has already caused delays in executions around the country.

Arizona officials have the drug, but defense lawyers for Mr. Landrigan are asking to stay the execution until the state reveals where it got its supply.

If Arizona obtained the drug from an overseas supplier, they argue, it may be substandard and violate Food and Drug Administration rules for importation.

Kent Scheidegger, legal director for the Criminal Justice Legal Foundation, a group that supports the death penalty, said that arguing over the safety of a drug for executions is "absurd."

"As long as it's a real drug manufacturer and not mixed up in somebody's garage, it doesn't matter where it came from," Mr. Scheidegger said. While the Food and Drug Administration is supposed to determine whether drugs are safe and effective, he said, "in this case, safe and effective are opposites."

Shelly Burgess, a spokeswoman for the F.D.A., said that imported drugs must go through an approval process before being used in the United States, but added that executions are "clearly

not under our purview or authority."

Megan McCracken, an adviser on lethal injection issues to the death penalty clinic at the University of California, Berkeley School of Law, argued that the origin of the drug used was nonetheless important under the law.

She cited the Eighth Amendment prohibition against cruel and unusual punishment, and a 2008 decision by the Supreme Court. In that case, Baze v. Rees, the court left room for challenges to execution methods that involve a demonstrated risk of severe pain compared with available alternatives.

To Ms. McCracken, the lack of information about the drug opens Arizona to a challenge under the Baze decision. "Its provenance matters," she said.

"I don't think you can say that thiopental is thiopental is thiopental."

Judge Roslyn O. Silver of United States District Court on Thursday asked the state to voluntarily reveal where the drug had come from. She set the matter for oral argument on Monday.

The state, in a brief filed Friday, declined to identify the source of the drug, citing state confidentiality laws intended to shield those involved in executions from harassment by death penalty opponents. It denied that the drug to be used was substandard, and suggested that the criticism of the drug was an "improper delay tactic."

The state, the brief said, "takes its responsibility to carry out an execution seriously and has attempted to construct a protocol to carry out executions as humanely as possible."

Kent E. Cattani, an Arizona assistant attorney general, said that the supply of the drug obtained by the state was effective, and noted that the protocol in place involved several methods for determining that the inmate was unconscious before administering the final drug. While an important concern with the administration of powerful anesthetics is that the patient might receive too much, Mr. Cattani explained, "it's obviously not a consideration here."

In fact, the amount that is given to inmates is more than 10 times the recommended dose for surgical procedures. "There's little or no chance that he would regain consciousness," he said.

If the judge insists on knowing the origins of the drug, he said, "we would ask that it be disclosed under seal."

To Ms. McCracken, the state's response was inadequate, akin to saying, "Just trust us," she said.