**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Jeffrey Timothy Landrigan,<br><br>                    Plaintiff,<br><br>vs.<br><br>Janice K. Brewer, Governor of the State of Arizona; Charles L. Ryan, Director of the Arizona Department of Corrections; Ernest Trujillo, Warden, Arizona Department of Corrections - Eyman; Carson McWilliams, Warden, Arizona Department of Corrections - Florence; Does 1-50,<br><br>                    Defendants. | No. CV-10-02246-PHX-ROS<br><br>**DEATH PENALTY CASE**<br><br><br>**ORDER GRANTING MOTION FOR A TEMPORARY RESTRAINING ORDER** |

Plaintiff Jeffrey Timothy Landrigan, an Arizona inmate under sentence of death, is scheduled to be executed at 10:00 a.m. on Tuesday, October 26, 2010.  On Thursday, October 21, 2010, he filed in this Court a civil rights complaint under 42 U.S.C. § 1983 alleging that the manner and means by which the Arizona Department of Corrections ("ADOC") intends to execute him will violate his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to due process.  (Doc. 1.)  He also moved for a temporary restraining order or preliminary injunction.  (Doc. 3.)

The Court ordered expedited briefing, set oral argument for October 25, 2010, and invited Defendants to "voluntarily provide detailed information concerning the sodium thiopental it intends to use in Plaintiff's execution" or explain their refusal to provide the

1   information.  (Doc. 6 at 4-5.)  Defendants chose not to provide the requested information.

2   (Doc. 7.)  The Court then issued an order vacating oral argument and directing Defendants

3   to "immediately and publically disclose information concerning the sodium thiopental ADOC

4   intends to use in Plaintiff's execution."  (Doc. 11 at 2.)  In particular, Defendants were to

5   provide "the source of the drug, the drug's expiration date, the *efficacy of the drug* for its

6   intended purpose . . . and all available documentation concerning the manufacturer and its

7   process for producing sodium thiopental."  (Doc. 11 at 4) (emphasis added).

8        On October 24, 2010, Defendants provided some of the requested information for *in*

9   *camera* review.  The Court issued an order directing Defendants to establish why the

10  provided information should remain under seal.  Defendants' arguments in support of

11  keeping this information under seal consist of repeated references to the Arizona law

12  prohibiting the disclosure of the "identity of executioners and other persons."  A.R.S. § 13-

13  757.  (Doc. 17 at 3).  Defendants did not assert that the information was privileged under

14  federal law.  Defendants have never provided any information regarding the efficacy of the

15  sodium thiopental at issue.

16       On October 25, 2010, Defendant publicly provided the expiration date of the sodium

17  thiopental and moved for reconsideration of the Order requiring the release of additional

18  information.  (Doc. 12).  The motion refused to publicly disclose the additional information

19  the Court ordered on the basis that by ordering the disclosure the Court had "improperly

20  engraft[ed] a requirement that the State use FDA-approved drugs."  (Doc. 12 at 2).  It is

21  unclear how Defendants read the directive regarding disclosure as a statement by this Court

22  that only FDA-approved drugs could be used.

23       Plaintiff opposed the motion for reconsideration, claiming the motion merely

24  presented the same arguments Defendants had already presented.  (Doc. 14 at 1-2).

25  Defendants filed a reply, again the miscontruing the FDA issue.

26                                    **BACKGROUND**

27       In 1989, Plaintiff escaped from an Oklahoma prison, where he was serving time for

28  second-degree murder, and shortly thereafter murdered Chester Dean Dyer in Arizona.  He

was convicted by a jury of theft, second-degree burglary, and felony murder for causing the victim's death in the course of a burglary, and the trial judge sentenced him to death. The facts surrounding the crime are set forth in the Arizona Supreme Court's decision affirming the convictions and sentence on appeal. *See State v. Landrigan*, 176 Ariz. 1, 3-4, 859 P.2d 111, 113-14 (1993).

Because Plaintiff committed his crime before November 23, 1992, under Arizona law he had the choice to be executed by either lethal injection or lethal gas. *See* A.R.S. § 13-757(B). According to his complaint, Plaintiff declined to choose. Consequently, ADOC must use lethal injection to execute Plaintiff. *Id.* Similar to other states, Arizona's protocol for execution by lethal injection requires sequential administration of sodium thiopental, pancuronium bromide, and potassium chloride. In 2007, seven Arizona death row prisoners challenged this protocol in a civil rights action filed under 42 U.S.C. § 1983. In 2009, United States District Court Judge Neil V. Wake granted summary judgment in favor of the State, concluding that Arizona's three-drug protocol is "substantially similar" to that approved by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008).[1] *See Dickens v. Brewer*, No. CV-07-1770-PHX-NVW, 2009 WL 1904294 (D. Ariz. Jul. 1, 2009) (unpublished order). During the *Dickens* litigation, the following facts concerning Arizona's three-drug protocol were undisputed:[2]

> Sodium thiopental is an ultrafast-acting barbiturate that induces unconsciousness. An intravenous dose of one gram of sodium thiopental is considered to be lethal, and the five gram dose administered under the Arizona Protocol is eleven to eighteen times more than that required to produce a loss of consciousness. A *properly administered dose* of five grams of sodium thiopental will produce a deep and long-lasting anesthesia in all people and eventually will cause death from respiratory arrest and cardiac depression. When successfully delivered into the circulation in sufficient quantities, sodium thiopental causes depression of the nervous system that would permit

---

[1] Landrigan is not one of the plaintiffs in *Dickens v. Brewer*, which is presently on appeal in the Ninth Circuit Court of Appeals.

[2] Contrary to the instant proceedings, Defendants willingly engaged in significant dicovery in the *Dickens* litigation, including detailed information about Arizona's protocol and the indvidiuals involved in the execution process.

excruciatingly painful procedures to be performed without causing discomfort or distress. Assuming the IV line is placed correctly in the vein and the sodium thiopental is delivered successfully into the bloodstream, five grams of intravenous sodium thiopental alone would cause certain unconsciousness and ultimately death within a relatively short period and with little to no risk of significant pain.

Pancuronium bromide is a paralytic neuromuscular blocking agent that prevents any voluntary muscle contraction. Pancuronium bromide mitigates involuntary muscle spasms often caused by potassium chloride, which may be unpleasant for witnesses to watch. The dose administered for lethal injection in Arizona is thirteen to twenty-six times more than the therapeutic dose and is likely to cause respiratory failure and circulatory collapse. Pancuronium bromide does not affect consciousness, sensation, cognition, or the ability to feel pain and suffocation. Therefore, an individual who is not completely anesthetized when he receives a dose of pancuronium bromide at therapeutic level or greater would experience a feeling of shortness of breath or "air hunger" and would be unable to move or otherwise respond. If administered to a conscious person, pancuronium bromide would cause severe agony because the person would be unable to breathe for several minutes before losing consciousness. Further, where sodium thiopental is not properly administered in a dose sufficient to cause loss of consciousness for the duration of the execution procedure, the use of pancuronium bromide will do nothing to alleviate the extreme pain of the intravenous injection of concentrated potassium chloride.

Potassium chloride is a salt found in all tissues in the body and is critical for maintaining normal cellular function and the excitability of muscles and nerves. The dose administered for lethal injection in Arizona is six times more than the therapeutic dose and is very likely to cause skeletal muscle paralysis and cardiac arrest. If potassium chloride were administered to a conscious person, the person likely would experience a severe burning sensation in the vein in which it is injected. Furthermore, the person likely would experience chest pain after the potassium chloride reached the heart, but before the person lost consciousness as a result of lack of blood flow to the brain. Because potassium chloride stops the heart, it produces electrical inactivity (*i.e.*, a flatline) on the electrocardiogram ("EKG"), which may be observed remotely without needing to physically examine the inmate. Death from potassium chloride may be pronounced more quickly than if the inmate were given sodium thiopental alone and thus died from decreased oxygen delivery to critical organs such as the heart and brain.

*Id.* at *11-12.[3] The Arizona protocol does not require the chemicals come from an FDA-approved source and apparently the issue was not raised in the *Dickens* litigation.

_____

[3]     Arizona's three-drug protocol contains nine pages setting forth the "Preparation and Administration of Chemicals." Therefore, the protocol recognizes the need for the proper care and handling of these chemicals. *Id.* at 9 (stating the chemicals must "be stored in a secured locked area that is temperature regulated and monitored to ensure compliance with manufacturer specifications").

1    Nevertheless, Arizona's three-drug protocol specifies which drugs must be used.  That is, the

2    unstated assumption of the protocol's lengthy discussion of the chemicals is that the sodium

3    thiopental used in executions will, in fact, be sodium thiopental and it will operate in its

4    intended manner.

5        As the Supreme Court noted in *Baze*: "It is uncontested that, failing a proper dose of

6    sodium thiopental that would render [a] prisoner unconscious, there is a substantial,

7    constitutionally unacceptable risk of suffocation from the administration of pancuronium

8    bromide and pain from the injection of potassium chloride."  553 U.S. at 53.

9        Around the same time the plaintiffs in *Dickens* filed suit in federal court, Plaintiff

10   sought post-conviction relief in state court challenging Arizona's lethal injection protocol on

11   state law grounds.  Two years later, on October 8, 2009, the state superior court denied post-

12   conviction relief, adopting in large part Judge Wake's ruling in *Dickens* and concluding that

13   Arizona's three-drug protocol is "substantially similar" to that approved by the Supreme

14   Court in *Baze*.  Plaintiff sought discretionary review in the Arizona Supreme Court, which

15   denied the petition on April 6, 2010.

16       Thereafter, the State moved the Arizona Supreme Court to issue a warrant of

17   execution.  Plaintiff opposed the motion in May 2010 on numerous grounds, including the

18   pendency of federal appellate proceedings in *Dickens*.  On September 15, 2010, Plaintiff

19   supplemented his opposition with a motion to defer ruling on the State's request for a warrant

20   of execution.  He asserted for the first time that there was a nationwide shortage of sodium

21   thiopental and that the court should delay ruling on the warrant request until the State had

22   demonstrated that it possessed or could legally obtain the drugs necessary to carry out his

23   execution in a manner consistent with Arizona's protocol.

24       On September 21, 2010, the Arizona Supreme Court issued a warrant of execution,

25   setting Plaintiff's execution for October 26.  In a separate order, the court denied Plaintiff's

26   motion to defer ruling and directed the State to report by October 1 whether it possessed a

27   sufficient quantity of all the drugs necessary to carry out the execution.  On September 24,

28   2010, Plaintiff's counsel wrote ADOC Director Charles Ryan requesting notice of the

1   manner and means by which it acquired, or intended to acquire, the necessary drugs.
2   Director Ryan responded by letter stating only that ADOC would advise counsel and the
3   Arizona Supreme Court no later than October 1 whether it had obtained the necessary
4   chemicals.

5   On September 30, 2010, the State filed in the Arizona Supreme Court a letter from
6   Director Ryan indicating that ADOC had obtained the necessary supply of drugs. Plaintiff
7   then moved the Arizona Supreme Court to direct the State to provide: (1) a declaration
8   indicating the amount and source of the sodium thiopental to be used in his execution; (2) a
9   copy of the package label; (3) a copy of the lot number and expiration date; (4) all storage
10  information, including location and temperature; (5) all chain-of-custody information from
11  when the drug was acquired; and (6) assurances that none of the packages of drugs or
12  chemicals will have been opened prior to Plaintiff's scheduled execution. He further
13  requested that the State be ordered to adhere to its current written protocol, including the use
14  of sodium thiopental, and to refrain from amending the protocol while his warrant of
15  execution was pending. In response to this motion, the State submitted a declaration from
16  Director Ryan stating that ADOC "lawfully obtained the necessary chemicals under its
17  current written protocol – sodium thiopental, pancuronium bromide, and potassium chloride
18  – in sufficient quantity for an execution." (Doc. 3, Ex. E.) The declaration further avowed
19  that ADOC "intends to follow the current protocol as written." (*Id.*)

20  On October 20, 2010, the Arizona Supreme Court held oral argument on Plaintiff's
21  motion for disclosure. During argument, counsel for the State declined to reveal where
22  ADOC obtained the sodium thiopental for Plaintiff's execution but acknowledged that it was
23  not obtained from or manufactured by Hospira, Inc., which Plaintiff alleges is the only
24  manufacturer of sodium thiopental approved by the Food and Drug Administration ("FDA").
25  The State further reiterated that the drug was "lawfully" obtained and was not expired.[4]

26

27  _____

28      [4]   The precise method in which Defendants obtained the sodium thiopental at
    issue has not been disclosed. Sodium thiopental is a Schedule III controlled substance and,

- 6 -

1    Following argument, the Arizona Supreme Court summarily denied Plaintiff's disclosure

2    motion without explanation.  The next day Plaintiff initiated the instant proceedings.

3                                    **DISCUSSION**

4            In his § 1983 complaint, Plaintiff alleges that ADOC's use of sodium thiopental that

5    was manufactured by a foreign source not approved by the FDA creates a substantial and

6    unnecessary risk of serious harm in violation of his rights under the Eighth Amendment.

7    Plaintiff further claims that ADOC's failure to provide him notice regarding the sodium

8    thiopental it intends to use in his execution violates his right to due process under the

9    Fourteenth Amendment. Finally, Plaintiff alleges that the administration by a medical doctor

10   or other trained medical professional of non-FDA approved sodium thiopental from a foreign

11   source demonstrates deliberate indifference to his right to be free from cruel and unusual

12   punishment.   Plaintiff has moved for a temporary restraining order or a preliminary

13   injunction to enjoin his execution and to allow for litigation of these claims.

14   **I.    Legal Standard**

15          The standard for issuing a temporary restraining order is essentially the same as that

16   for issuing a preliminary injunction.  There are two alternative tests for determining whether

17   a movant is entitled to injunctive relief.  Under the first test, a movant must demonstrate (1)

18   that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the

19   absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an

20   injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365,

21   374 (2008).  Under the second test, a movant must show "serious questions going to the

22   merits and a hardship balance that tips sharply towards [the movant] . . . so long as [the

23   movant] also shows a likelihood of irreparable injury and that the injunction is in the public

24   interest." *Alliance for Wild Rockies v. Cottrell*, No. 09-35756,  2010 WL 3665149, *8 (9th

25   Cir. Sept. 22, 2010).  This latter test grants District Courts discretion "to preserve the *status*

26

27   presumably, there are procedures individuals must follow for the importation of such
     substances into the United States.  It is unclear what those procedures are and whether

28   Defendants complied with them.

*quo* with provisional relief until the merits [can] be sorted out." *Id.* at *7-8 *(quoting Save Strawberry Canyon v. Dep't of Energy*, 2009 WL 1098888, at *1-3 (N.D. Cal. Apr. 22, 2009)).

In the context of a capital case, the Supreme Court has emphasized that these principles apply when a condemned prisoner asks a federal court to enjoin his impending execution because "[f]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course." *Hill v. McDonough*, 547 U.S. 573, 583-84 (2006). Rather, "a stay of execution is an equitable remedy" and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.* at 584. In addition, "[a] court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." *Beardslee v. Woodford*, 395 F.3d 1064, 1068 (9th Cir. 2005) (quoting *Gomez v. United States District Court*, 503 U.S. 653, 654 (1991)). Thus, courts "must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim." *Id.* (quoting *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004)).

## II.   Factual Allegations

In his motion for injunctive relief, Plaintiff asserts that Hospira, Inc., is the only FDA-approved manufacturer of sodium thiopental, and that Hospira ceased manufacturing the drug around the time the State sought a warrant to execute Plaintiff. (Doc. 3 at 5.) Because the State admitted during oral argument before the Arizona Supreme Court that ADOC's supply of sodium thiopental was not manufactured by Hospira, Plaintiff contends that it must have been imported from a foreign country and that drugs from foreign countries "do not have the same assurance of safety as drugs actually regulated by the FDA." (*Id.* at 9-10 (citing *In re Canadian Import Antitrust Litigation*, 470 F.3d 785, 789 (8th Cir. 2006).) According to Plaintiff, because ADOC's supply of sodium thiopental lacks the appropriate safeguards, it could be "contaminated with toxins that cause pain, as opposed to unconsciousness" or could fail to properly anesthetize him, thus resulting in excruciating pain when the second and third

1   drugs are administered.  (*Id.* at 4, 10.)  Plaintiff further alleges that Arizona has feasible

2   alternatives – it can obtain sodium thiopental from Hospira when the company starts

3   manufacturing the drug again in early 2011, or it can use another available, FDA-approved

4   barbiturate.  (*Id.* at 10.)

5          In support of his motion, Plaintiff has proffered a declaration from Dr. John D.

6   Palmer, a medical doctor with expertise in clinical pharmacology, who asserts that "FDA

7   approval ensures that the product [is] pure and free of potentially harmful contaminants

8   produced in the production of the product" and that it "actually contains the amount and

9   concentration of drug as indicated on the label."  (Doc. 3, Ex. F at 3.)  Dr. Palmer cites as an

10  example of the importance of FDA involvement in foreign prescription drug production an

11  outbreak of life-threatening adverse reactions from contaminated heparin, a blood thinner,

12  produced in Chinese facilities.  (*Id.*)  Plaintiff further cites testimony from the FDA's

13  Associate Commissioner for Regulatory Affairs, who testified at a congressional hearing in

14  2004 that "[m]any drugs obtained from foreign sources that either purport to be or appear to

15  be the same as U.S.-approved prescription drugs are, in fact, of unknown quality. . . . These

16  outlets may dispense expired, subpotent, contaminated or counterfeit product, the wrong or

17  a contraindicated product."  (*Id.* at 8 (citing Statement of John M. Taylor, III, to the Senate

18  Permanent Subcommittee on Investigations, Committee on Governmental Affairs, July 22,

19  2004).)  In his reply brief, Plaintiff provides a letter from the FDA to the Governor of Texas

20  reiterating that drugs from foreign sources are of unknown quality and stating that the FDA

21  "cannot provide adequate assurance . . . that drugs from foreign countries are the same as

22  products approved by the FDA."  (Doc. 10, Ex. I.)

23         In response to Plaintiff's motion for injunctive relief, Defendants contend that

24  Arizona's protocol provides sufficient safeguards to ensure that a prisoner is unconscious

25  before ADOC administers the second and third drugs.  (Doc. 7 at 4-6.)  Specifically, the

26  protocol requires the medical team to use equipment to monitor the prisoner's condition and

27  to conduct a thorough physical examination to determine whether the prisoner is

28  unconscious.  Therefore, according to Defendants, there is no genuine risk Plaintiff will

suffer excruciating pain during the execution, regardless of the quality or source of the sodium thiopental.  Defendants also assert that neither the Arizona protocol nor controlling law requires a state to acquire lethal injection drugs only from FDA-approved manufacturers. (*Id.* at 6.)  Defendants make *no effort* to rebut Plaintiff's claim that there is a risk the sodium thiopental, if contaminated, could itself cause unnecessary pain and suffering.[5]

## III.   Eighth Amendment Principles

The Eighth Amendment "prohibits punishments that involve the unnecessary and wanton inflictions of pain, or that are inconsistent with evolving standards of decency that mark the progress of a maturing society." *Cooper v. Rimmer*, 379 F.3d 1029, 1032 (9th Cir. 2004).   That prohibition necessarily applies to the punishment of death, precluding executions that "involve torture or a lingering death, or do not accord with the dignity of man." *Beardslee*, 395 F.3d at 1070.  A violation of the Eighth Amendment can be established by demonstrating a "substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

In *Baze v. Rees*, the Supreme Court held that Kentucky's method of execution by lethal injection was consistent with the Eighth Amendment.   The decision encompassed seven separate opinions involving three blocks of Justices.  In *Ventura v. State*, 2 So.3d 194, 200 (Fla. 2009), the Florida Supreme Court observed that the *Baze* plurality:

> adopted a version of the substantial-risk standard, while Justice Breyer, concurring in the judgment, and Justices Ginsburg and Souter, dissenting, adopted a version of the unnecessary-risk standard.  In contrast, Justices Thomas and Scalia renounced any risk-based standard in favor of a rule of law that would uphold any method of execution which does not involve the *purposeful* infliction of "pain and suffering beyond that necessary to cause death."   Justice Stevens did not provide a separate standard but, instead, expressed general disagreement with (1) the death penalty based upon his long

---

[5] Defendants have repeatedly misconstrued this issue.  Defendants stress that Arizona's protocol ensures that pancuronium bromide and potassium chloride will be administered only to an unconscious prisoner.  While the protocol does offer safeguards in the event that inferior sodium thiopental fails to properly anesthetize Plaintiff, those safeguards do nothing to prevent the risk of harm from contaminants or a counterfeit product. A core portion of Plaintiff's claim–a portion Defendants choose to ignore–is that there may be a substantial risk of serious harm due to the administration of the sodium thiopental itself.

1  experience with these cases and the purported erosion of the penalty's
2  theoretical underpinnings (deterrence, incapacitation, and retribution), and (2)
   the allegedly unnecessary use of the paralytic drug pancuronium bromide.

3  *Id.* at 199-200 (citations and footnotes omitted).  In response to Justice Stevens's suggestion

4  that the plurality opinion leaves the disposition of other cases uncertain, Chief Justice

5  Roberts wrote:

6  [T]he standard we set forth here resolves more challenges than [Justice
   Stevens] acknowledges.  A stay of execution may not be granted on grounds
7  such as those asserted here unless the condemned prisoner establishes that the
   State's lethal injection protocol creates a demonstrated risk of severe pain.  *He*
8  *must show that the risk is substantial when compared to the known and*
   *available alternatives.*  A State with a lethal injection protocol similar to the
9  protocol we uphold today would not create a risk that meets this standard.

10  *Baze*, 553 U.S. at 61 (emphasis added).

11  In *Baze*, the petitioners raised numerous challenges to Kentucky's protocol, but none

12  involved the precise issue presented here: whether use of non-FDA approved sodium

13  thiopental and the failure to disclose the source creates a substantial risk of serious harm,

14  especially when compared to the availability of other FDA-approved barbiturates.  After

15  consideration of the pleadings and relevant law, the Court concludes Plaintiff has made as

16  strong a showing of likelihood of success as he is able and there are serious questions

17  regarding the merits of Plaintiff's claims.  Also, the balance of hardships tips sharply in

18  Plaintiff's favor as does the likelihood of irreparable harm.  Finally, the public's interest in

19  executing Plaintiff in a manner consistent with Eighth Amendment protections supports the

20  issuance of a preliminary injunction.  *See Cottrell*, 2010 WL 3665149, at *4-5.

21  **IV.   Analysis**

22  As an initial matter, and because the issue of delay is particularly relevant in assessing

23  a request for a stay of execution, the Court will address that issue before applying the *Winter*

24  standard for injunctive relief.

25  Defendants argue that Plaintiff unreasonably delayed filing his § 1983 complaint and

26  that a stay should be denied on this ground.  They assert that Plaintiff was aware of the

27  national shortage of sodium thiopental since at least May 2010 and could have brought suit

28  sooner.  Plaintiff counters that he diligently sought information from ADOC regarding its

1    acquisition of sodium thiopental as soon as he learned from a newspaper article in late
2    September that the State's attorney was "not optimistic about obtaining sodium thiopental."
3    (Doc. 3 at 13.)  Furthermore, Plaintiff did not learn definitively that ADOC intended to use
4    a non-FDA approved drug until the day before he filed the instant complaint, when the
5    State's attorney informed the Arizona Supreme Court that ADOC's supply of sodium
6    thiopental was not manufactured by Hospira.  The Court agrees with Plaintiff.

7         The instant complaint does not challenge ADOC's lethal injection protocol, a claim
8    Plaintiff clearly could have raised years ago.  Rather, his claims are limited to the
9    administration of sodium thiopental from a non-FDA approved source.  Plaintiff had no
10   verifiable information that ADOC intended to use sodium thiopental from a non-FDA
11   approved manufacturer prior to oral argument before the Arizona Supreme Court on October
12   20, 2010.  Without this information, Plaintiff had no basis to attack ADOC's plan to use
13   drugs obtained from such a source.  Plaintiff filed his complaint one day after learning the
14   relevant information.  Accordingly, the Court finds that Plaintiff did not purposely delay
15   bringing his claims; rather he pursued them aggressively "as soon as he viewed them as
16   ripe." *Beardslee*, 395 F.3d at 1069 (directing district courts to conduct a fact-specific inquiry
17   to ascertain whether claims could have been brought earlier and whether a petitioner has
18   good cause for delay).  For this reason, the equitable concerns that often arise from a
19   condemned prisoner's last-minute attempts to manipulate the system are absent here.

20        **A.    Likelihood of Success or Serious Questions Going to the Merits**

21        It is well-established that Plaintiff bears the burden of proving entitlement to
22   injunctive relief. *Winter*, 129 S. Ct. at 374.  The unique circumstances presented in this case
23   are that Defendants have refused to provide the information to Plaintiff that would allow him
24   to attempt to carry his burden.  Defendants did not inform Plaintiff they planned on using
25   sodium thiopental from a non-FDA-approved source until October 20, 2010.  If Defendants
26   had provided all available information regarding the particular drug on that date, Plaintiff
27   would have had time to develop evidence showing the drug presented a substantial risk of
28   serious harm.  Given the exceptionally short time period, that showing would have been

1    difficult.  But Defendants did not provide Plaintiff even this short time.  Instead, Defendants

2    refused to disclose to Plaintiff *any* information regarding the drug.  Defendants maintained

3    their refusal to disclose even after a direct Court order requiring "immediate" disclosure.

4    Defendants have not explained how Plaintiff could show he is likely to succeed on his claims

5    that this particular drug presents a substantial risk when Defendants have refused to provide

6    the information from which Plaintiff could make such an argument.

7            If a prisoner is permitted to challenge his execution via a 42 U.S.C. § 1983 suit, he

8    must be entitled to the factual information underlying his claims that is solely in the

9    possession and control of the defendants.  Were this not the case, many § 1983 suits could

10   be defeated by defendants simply refusing to provide discovery.  The Court does not believe

11   Defendants should be allowed to effectively foreclose such challenges by refusing to provide

12   evidence.  Thus, the Court is presented with a situation where Plaintiff has made facially

13   plausible claims, the evidence regarding those claims is solely in Defendants' possession, and

14   Defendants have refused to produce the evidence necessary for the Court to make an

15   informed preliminary evaluation of those claims.

16           The most analogous case of which the Court is aware is *Brown v. Vail*, C09-5101-JCC

17   from the Western District of Washington.  There, Mr. Brown was scheduled to be executed

18   on September 10, 2010.  Mr. Brown filed an emergency motion to stay his execution on

19   August 16, 2010.  His main challenge was that the State of Washington had not shown that

20   the members of the execution team were sufficiently competent to carry out the execution.

21   *Brown v. Vail*, C09-5101-JCC (W.D. Wash. Aug. 31, 2010).  In response to this claim, the

22   superintendent of the Washington State Penitentiary submitted a sworn statement that each

23   member of the execution team was sufficiently qualified.  *Id.* at 16.  The court concluded this

24   evidence was sufficient to defeat Mr. Brown's conjecture regarding untrained personnel.  *Id.*

25   at 18.  The situation here is different.

26           Plaintiff did not learn the factual basis for his current claim until October 20, 2010,

27   six days prior to his execution.  Unlike the State of Washington that immediately *proffered*

28   *evidence within its control* to defeat Mr. Brown's claims, Defendants here have repeatedly

1    refused to provide any of the underlying factual information necessary for resolution of

2    Plaintiff's claims.   Defendants could have immediately provided Plaintiff information

3    regarding the drug or, even better, Defendants could have submitted an affidavit stating that

4    the drug was obtained through reputable sources and there was no reason to question that it

5    would function as intended.  Instead of these options, Defendants chose to engage in repeated

6    motion practice attempting to prevent the release of *any* details of the drug.

7         The Court is perplexed by Defendants' behavior in this case.  Based on this Court's

8    experience, Defendants actions are highly unusual.  Normally, a defendant opposing a motion

9    for emergency injunctive relief is eager to provide the evidence showing that the plaintiff's

10   claims lack merit.   This Court has never experienced a situation such as this where a

11   defendant opposes a motion for emergency relief by claiming it has the evidence necessary

12   for resolution of the matter but that evidence should not be produced.  Defendants have never

13   adequately explained their rationale for withholding *all* evidence regarding the drug, and

14   Defendants have now created a situation where a seemingly simple claim that could have

15   been resolved well in advance of the execution must be resolved in five days – and now only

16   eighteen hours due to further protractions created only be Defendants – without the benefit

17   of Plaintiff having the opportunity to present fact-based arguments.

18        Based on the record, the Court concludes that use of sodium thiopental from a non-

19   FDA-approved source raises issues regarding its efficacy and possible side-effects.  The

20   Court is unable to determine whether the drug was produced by a foreign company that

21   follows standard operating procedures for the drug's manufacture or that has no history of

22   contamination in manufacturing the product.  Absent such evidence, the Court must accept

23   Plaintiff's factual showing that such drugs are more likely to contain harmful contaminants.

24   (Affidavit of Dr. John D. Palmer, Doc. 3, Ex. F at 3.)  Consequently, Plaintiff has shown as

25   much likelihood of success as he possibly could given Defendants' obstructive behavior.

26   Alternatively, Plaintiff has made a sufficient factual showing that there are "serious questions

27   going to the merits." *Cottrell*, No. 09-35756,  2010 WL 3665149 (9th Cir. Sept. 22, 2010).

28        The Court reiterates that it does not assume that the Eighth Amendment categorically

1    prohibits the use of non-FDA approved drugs.  In fact, it seems likely that the Eighth

2    Amendment *does not* prohibit the use of such drugs.  But the issue here is not simply FDA-

3    approval.  Instead, the issue is whether there is a sufficient level of confidence that the

4    sodium thiopental Defendants plan on using to sedate Plaintiff does not create a substantial

5    risk of harm.  FDA-approval is relevant in that drugs manufactured under FDA-guidelines

6    are likely to perform as expected; drugs manufactured by non-FDA approved sources might

7    not benefit from such a presumption.  Without the assurance of FDA-approval, the Court is

8    left to speculate whether the non-FDA approved drug will perform in the exact same manner

9    as an FDA-approved drug and whether the non-FDA approved drug will cause pain and

10   suffering.   This is not a factual issue the Court can resolve by adopting Defendants'

11   assurances that sodium thiopental "is simply a chemical compound" and the source of that

12   compound is irrelevant.  (Doc. 7 at 6).

13           **B.        Irreparable Harm & Balance of Equities**

14           Having established a likelihood of success or serious questions going to the merits,

15   the Court next assesses the relative harms to the parties that will be incurred by the grant or

16   denial of injunctive relief and the balance of equities.  With regard to the State, there appears

17   to be little potential for significant injury.   The stay Plaintiff seeks would *not* preclude

18   Defendants from employing an alternative means of carrying out the execution.  Defendants

19   could, if they wished, substitute an available FDA-approved barbiturate or obtain sodium

20   thiopental from Hospira when it renews manufacture of the drug in several months.  Perhaps

21   most simply, Defendants could provide the information regarding its current store of sodium

22   thiopental to Plaintiff.  Doing so would allow Plaintiff to investigate the drug and confirm

23   it will operate as intended.[6]  Although Plaintiff committed his crime over twenty years ago

24   _____

25           [6] This is not realigning the burden of proof.  As mentioned earlier, a party cannot
     refuse to provide discovery necessary to the opposing party's case and then claim that the
26   opposing party's claims fail for lack of factual support.  Burdens of proof are premised on
     the party bearing the burden having access to relevant evidence.  *See Anderson v. Liberty*
27   *Lobby, Inc.*, 477 U.S. 242, 257 (1986) (observing plaintiff must present evidence "even
     where the evidence is likely to be within the possession of the defendant, *as long as the*
28

1   and the State has "a significant interest in enforcing its criminal judgments," *Nelson*, 541

2   U.S. at 650, it is unclear how a short, temporary stay to resolve Plaintiff's claims will

3   threaten that interest.

4        The potential harm to Plaintiff, on the other hand, is patent.  In the absence of

5   injunctive relief, Plaintiff will be executed in eighteen hours using a drug of unknown quality

6   that was obtained from an unidentified, non-FDA approved source.  Because Defendants

7   have refused to provide information to Plaintiff about the source of the drug or the

8   manufacturer, this Court cannot say that Plaintiff faces no significant risk of suffering serious

9   harm.

10       The balance of equities favors Plaintiff because a stay could have been avoided had

11  the State timely disclosed the source of its sodium thiopental.  As previously explained, and

12  as set forth in yet more detail below, the Court rejects Defendants' argument that they are

13  precluded by A.R.S. § 13-747(C) from providing information such as the source of the

14  chemicals, labels, and lot numbers. *See* Section V.

15       Weighing the relative burdens on the parties, the Court concludes that a temporary

16  stay of execution will allow for responsible adjudication of Plaintiff's claims without

17  significant damage to the State's interest in enforcing its criminal judgments or irreparable

18  harm to Plaintiff. *See Morales v. Cate*, Nos. 5-6-cv-219-JF-HRL, 5-6-cv-926-JF-HRL, 2010

19  WL 3835655, at *4 (N.D. Cal. Sept. 28, 2010) (granting stay of execution because the court

20  did not have time prior to the execution "to render a reasoned decision and permit adequate

21  appellate review").

22       **C.    Public Interest**

23       Finally, the Court finds that the public's interest will not be disserved by a temporary

24  injunction.  The Court is cognizant that Plaintiff murdered Mr. Dyer over twenty years ago.

25  However, the Court finds that no significant harm to the public interest will arise from the

26  proper, informed, and deliberate adjudication of Plaintiff's claims. *See, e.g.*, *Nken v. Holder*,

27  ―――――――――

28  *plaintiff has had a full opportunity to conduct discovery*") (emphasis added).

129 S. Ct. 1749, 1757 (2009) ("A reviewing court must bring considered judgment to bear on the matter before it, but that cannot always be done quickly enough to afford relief to the party aggrieved by the order under review.  The choice for a reviewing court should not be between justice on the fly or participation in what may be an 'idle ceremony'.").  Rather, temporary injunctive relief will serve the public's interest in executing Plaintiff in a manner consistent with the Eighth Amendment.  *See Trop v. Dulles*, 356 U.S. 86, 100 (1958) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.  While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards.").

**V.  Disclosure Obligations**

Despite the Court previously explaining that Defendants' statutory argument is unavailing, Defendants continue to assert that Arizona law prohibits the release of *any* information regarding the drug it plans on using.  Defendants are incorrect and they must release all relevant information regarding the drug.

In federal question cases, such as this, state law privileges do not automatically apply.  *Kerr v. U.S. Dist. Court of N. Dist. of Cal.*, 511 F.2d 192, 197 (9th Cir. 1975) ("Reference to federal law in this case is necessary on the issue of the existence and scope of the claimed privilege.").  Defendants have made no effort to establish that *federal law* somehow prevents the disclosure of this information.  But even if the state law applied here, Defendants' interpretation is incorrect.

Arizona law provides

> The identity of executioners and other persons who participate or perform ancillary functions in an execution and any information contained in records that would identify those persons is confidential and is not subject to disclosure pursuant to title 39, chapter 1, article 2.

A.R.S. § 13-757(C).  The statute also provides that

> If a person who participates or performs ancillary functions in an execution is licensed by a board, the licensing board shall not suspend or revoke the person's license as a result of the person's participation in an execution.

A.R.S. § 13-757(D).  Defendants claim this statute prevents the disclosure of additional

information regarding the drug because disclosure of the corporations involved in the manufacture and distribution of the drug will "lead to the identity of individuals participating in an ancillary function in an execution."   (Doc. 12 at 4).   This interpretation is not compelling.

The Arizona statute cannot be read as protecting the disclosure of any information which might eventually, somehow, lead to the "identity of executioners and other persons." Defendants do not point to any provision in the statute itself in support of this claim.  If the Arizona Legislature wished to protect all individuals potentially involved in executions, the statute should not have provided protection only to "executioners and other persons who participate or perform ancillary functions in an execution."  The statute instead would provide protection to all information conceivably related to the execution.[7]

## CONCLUSION

Plaintiff has met his burden of demonstrating that a temporary stay of execution is warranted to allow the Court to fully consider his challenge to Arizona's use of sodium thiopental obtained from an unidentified, non-FDA approved source.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for a Temporary Restraining Order or a Preliminary Injunction (Doc. 3) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants are enjoined from carrying out Plaintiff's sentence of death until further order of the Court.

**IT IS FURTHER ORDERED** that the Motion for Reconsideration (Doc. 12) is **DENIED**.  Defendants shall immediately disclose to Plaintiff the documents provided to the Court.

**IT IS FURTHER ORDERED** that the Motion to Seal (Doc. 17) is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court make immediate telephonic

---

[7] Defendants' claim that this statute prevents the disclosure of the manufacturer of the sodium thiopental is puzzling given Defendants' willingness to disclose Hospira as its prior source of the sodium thiopental.

1  notice of this Order to Charles L. Ryan, Director of the Arizona Department of Corrections
2  and Carson McWilliams, Warden of the Arizona State Penitentiary at Florence, and that a
3  copy of this Order be served on these individuals by the United States Marshal forthwith.
4        DATED this 25th day of October, 2010.

        Roslyn O. Silver
        United States District Judge